IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ADAM PALINSKI, Plaintiff, v. JOSEPH MATHY, Defendant. | Case No. 08 C 4581<br>Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

On November 6, 2003, a jury in the Circuit Court of DuPage County, Illinois convicted Petitioner Adam Palinski ("Palinski") of arson and aggravated arson. On November 19, 2003, a separate jury convicted Palinski of solicitation of first degree murder. The circuit judge sentenced him to concurrent sentences of six years and ten months for arson and fifteen years for aggravated arson. Additionally, Palinski received a sentence of twenty four years for solicitation of first degree murder to run consecutively with the other sentences. He is currently serving his sentences in the Pontiac Correctional Center located in Pontiac, Illinois. He now brings a petition for habeas corpus pursuant to 28 U.S.C. § 2254 alleging various violations of his rights. For the reasons stated, Palinski's petition is denied.

## STATEMENT OF FACTS

The Court adopts the underlying facts set forth by the Illinois Appellate Court in *People v. Palinski*, Nos. 2-04-0082, 2-04-0084, 2-04-0249 (consol.) (Ill. App. Ct. Oct. 21, 2005) (unpublished) because Palinski does not present clear and convincing evidence challenging those facts. *See* 28 U.S.C. § 2254(e)(1); *see also Virsnieks v. Smith*, 521 F.3d 707, 714 (7th Cir. 2008).

1

I.  The Arson Case

   In the early morning hours of March 18, 2002, a fire completely destroyed St. Michael's Church in Wheaton, Illinois.  That same morning, a fire caused damage to the residence of one of Palinski's neighbors.  The next day, Thomas Mottier ("Mottier"), one of Palinski's friends, asked Palinski if he had heard about the fire at the church.  Palinski responded by bragging that he burned the church down.  Mottier contacted the local police to report Palinski.  On March 20, 2002, Mottier agreed to allow the police to record a telephone conversation between him and Palinski.  The taped conversation began with the friends making general small talk until Mottier asked if Palinski had seen the stories about the church fire in the newspapers.  Palinski responded by asking Mottier to save a copy of the newspaper as a "souvenir."  After Mottier asked some questions about the fire, Palinski gave a detailed description of how he entered the church, drank wine from the sacristy's refrigerator, found a box of matches and lit the altar's tablecloth on fire.  Then he described using the matches to light hanging tapestries on fire before he went back to the sacristy and threw lit matches into garbage cans that contained tissue papers and dead flower petals.  He said that after a while, the fires in the garbage cans were raging and smoke filled the church.  At that point, he ran out of the church and walked home.

   Palinski then volunteered that he started the fire at his neighbor's house as well.  He told Mottier that he went home after he started the fire at the church, took a can of gasoline from his garage, poured the gasoline on the neighbor's vinyl siding and back porch in five different spots and lit it on fire with his lighter.  Then he ran back to his house, placed the gas can back in the garage and ate some food while he listened for the fire engines.  Mottier asked him if he was serious about the story.  Palinski responded by laughing, saying that he would not make up a story like that.  He

2

also explained that he was motivated to start the fire because he believed that the type of treatment he received in Catholic school "scars kids." He said he did not feel bad about burning the church down because it could be rebuilt after it received insurance money and money from the diocese.

Based on the information obtained in the monitored telephone call, the Wheaton Police Department arrested Palinski on March 21, 2002. Starting at 11:35 a.m., Detective William Cooley ("Cooley") interviewed Palinski. Cooley advised Palinski of his *Miranda* rights, and Palinski responded by asking if he needed an attorney. Cooley said that he could not provide him with legal advice. Palinski then indicated that he would speak with the police and he signed the police department's *Miranda* waiver form. Cooley and another officer conducted the interview. Cooley described Palinski's demeanor as "very cooperative, relaxed [and] communicative." Other than Palinski's initial inquiry about whether he should have a lawyer present, he did not mention anything further about speaking with a lawyer. After two and a half hours, they took a one hour break and the police provided Palinski with food, soft drinks and the opportunity to use the restroom. When the police asked Palinski if he would be willing to preserve his statement in writing or on videotape, he said that he would provide them with a videotaped confession. Twenty minutes later, after the officers had set up the video equipment, Cooley reread Palinski his *Miranda* rights and explained that the police were going to tape his statement. Palinski then provided his confession.

Palinski moved to suppress his confession on the grounds that he asked for a lawyer during the interview and that he asked for his wallet during the interview so he could retrieve a lawyer's business card. He did not testify at the suppression hearing. The trial court denied the motion to suppress, finding that he had not asked for a lawyer or asked for his wallet during the interview. The trial court then reopened the proceeding so that Palinski could testify. When he took the stand, he

claimed that he requested a lawyer before the interview began when he asked Cooley if he needed a lawyer. Additionally, he claimed that he stopped the interview and refused to answer a question without his lawyer present. He conceded that he did not request a lawyer during the taped portion of the interview. Based on a finding that Palinski's testimony was not credible, the trial court once again denied the motion to suppress.

Before the trial, but approximately nine months after the confession, Dr. James Corcoran ("Dr. Corcoran") conducted an examination to determine Palinski's mental fitness. Through Dr. Corcoran, Palinski sought to introduce testimony that Narcissistic Personality Disorder made him prone to lying and creating fantastical stories about himself. The proffered testimony would support his claim that he gave a false confession to Mottier and the police. The trial court granted the prosecution's motion to bar Dr. Corcoran's testimony, finding that the testimony was irrelevant because Palinski had not been diagnosed with Narcissistic Personality Disorder at the time that he confessed to starting the fires. Additionally, the trial court found that the prosecution could not conduct an effective cross-examination of Dr. Corcoran's testimony because he based his opinions entirely on what Palinski told him.

During the trial, the prosecution sought to admit entries from Palinski's journal into evidence to establish his motive for starting the fires. Palinski claimed that the passages were irrelevant to the charged offenses and that their prejudicial effect outweighed their probative value. After reviewing the entries, the trial court admitted entries written during the six months preceding the fires, but found that earlier entries were not relevant to Palinski's state of mind at the time of the fires. One contested entry he wrote four months before the fires stated:

> I want to destroy something beautiful. I have this overwhelming urge
> to destroy something and just be bad. Call it misplaced teen angst or

4

>hormones or evil, or whatever–I am full of this fire, though. And it's
>burning out of control . . . . I'm pissed off and want to act out my
>rage.

Cooley testified at the trial regarding the interview that he conducted with Palinski at the Wheaton police station. He said that during the interview, Palinski admitted that he was walking home from a friend's house in the early morning hours of March 18, 2002 when he entered St. Michael's Church through an unlocked side door to escape from the cold. He then described that he entered the sacristy, began to drink from a bottle of wine that he found, and stood at the altar delivering a mock sermon. After that, he said that he played some songs on the church's piano, defaced a Bible and attempted to steal a chalice from the tabernacle. When he returned the bottle of wine to the sacristy's refrigerator, he said that he found a box of matches that he used to start the fires in the garbage cans.

Cooley then testified about Palinski's statements about starting a fire at his neighbor's house. Palinski told Cooley that he walked past the house on his way home from the church. He believed that the neighbors exhibited a lack of consideration to the neighborhood, which fed and housed other neighbors when the house of those neighbors had burned down a year earlier. As he walked past the house, he decided to light it on fire. He retrieved a can of gasoline from his garage, returned to the neighbor's house, and proceeded to pour the gasoline on several areas of the house, including the vinyl siding and the back porch. He stated that once he ignited portions of the house, he watched the siding burn and then returned to his house.

The prosecution also called Mottier as a witness. After he testified that Palinski boasted to him about setting fire to the church, Mottier described his participation in the recorded phone call

5

with Palinski. The prosecution then played the recorded conversation and Palinski's videotaped confession for the jury.

Palinski was the last witness to testify at his trial. He denied setting either fire, claiming that he falsely confessed to Mottier because his friends had abandoned him and he felt starved for attention. He hoped that telling Mottier that he had started the fires would force Mottier to get more involved in his life. He also claimed that he made up his confession to Cooley only after the police "broke him down." Palinski then attempted to explain his journal entry, contending that he wrote the passage about destroying something beautiful only because he wanted to improve his poor grade in class by trying to create "more colorful journal entries." Finally, Palinski explained his confession, claiming that he had a tendency to lie because he had Narcissistic Personality Disorder.

The jury found Palinski guilty of arson with respect to the church fire and aggravated arson with respect to the fire at his neighbor's house. After the trial, Palinski learned that Detective Garlish, who was not involved in the prosecution of Palinski, created a police report reflecting that Palinski had confessed to a murder he did not commit because he thought it was what the interrogating officer wanted to hear. The report indicated that Cooley had been present for the false murder confession. After learning about the existence of this police report, Palinski moved for a new trial, claiming that the failure to disclose the report violated his due process right to a fair trial. The trial court denied Palinski's motion.

II. The Solicitation of First Degree Murder Case

While Palinski was in custody awaiting his arson trial, the State charged him with solicitation of first degree murder for attempts that he made to hire someone to kill Mottier before he could testify against Palinski in the arson trial. Palinski stood trial for this charge shortly after the conclusion of the arson trial.

During the solicitation trial, the prosecution presented two inmates who testified that Palinski approached them to express his desire to have Mottier killed. Ray Garvin ("Garvin"), another inmate, overheard Palinski's requests and, through his lawyer, offered to cooperate with law enforcement personnel investigating Palinski's conduct. Garvin wore a recording device in his shirt pocket and acted as a conduit between Palinski and "Tony," an undercover police officer posing as a hit man. In connection with the investigation, Garvin had several recorded conversations with Palinski to discuss how they would get Tony to kill Mottier. During these conversations, Palinski revealed that he would like Tony to break some of Mottier's bones before slitting his throat.

Additionally, law enforcement obtained recorded conversations between Kristie Karels ("Karels") and Palinski. Karels started a relationship with Palinski after she read about him in the newspaper. When she visited Palinski, he asked to borrow $500 from her so that he could give Tony a down payment. At the time she spoke with Palinski, neither of them knew that their conversation was being recorded. After she refused to give him the money, law enforcement obtained assistance from Jennifer Williams ("Williams"), Palinski's former girlfriend who visited him in jail and spoke with him on the phone. During her conversations with Palinski, Williams agreed to give him the money he needed to hire Tony. Palinski responded by directing her to the location where she could deliver the money to Tony. A few days later, Williams returned to the jail to inform Palinski that

7

she had delivered the money. He responded by saying that he would be happy to see the news of Mottier's death on television. Palinski then relayed instructions for how he wanted Tony to kill Mottier.

In addition to the tape recordings, the prosecution introduced evidence that Mottier had served as a police informant during the arson investigation into the fires at the church and the neighbor's home over Palinski's objection. Additionally, the trial court allowed the prosecution to introduce evidence that Palinski had confessed to starting the fires. The trial court excluded Palinski's videotaped arson confession and evidence of Palinski's conviction in the arson case. At trial, Palinski raised entrapment as a defense, claiming that the state, acting through Garvin, induced him to commit the offense. The jury rejected that defense and found Palinski guilty of solicitation of first degree murder.

III. Post-Conviction Proceedings

The Illinois Appellate Court consolidated Palinski's direct appeals of his arson and solicitation convictions. With respect to his arson conviction, Palinski claimed that the prosecution violated his due process right to a fair trial by failing to disclose evidence that Palinski had given a false confession to another crime. He also claimed that the trial court erred when it: 1) denied his motion to suppress his confession; 2) admitted only the videotaped portion of his confession; 3) did not allow Palinski to present expert testimony regarding Narcissistic Personality Disorder to rebut the reliability of his confession; and 4) admitted passages from his journal as evidence. With respect to his solicitation of first degree murder conviction, Palinski claimed that the trial court erred when it admitted some of the details of his arson conviction. The appellate court affirmed both of Palinski's convictions. *See People v. Palinski*, Nos. 2-04-0082, 2-04-0084, 2-04-0249 (consol.) (Ill.

App. Ct. Oct. 21, 2005) (unpublished). The Illinois Supreme Court denied Palinski's Petition for Leave to Appeal without comment. *See People v. Palinski*, No. 101701, 844 N.E.2d 970 (Table) (Ill. Jan. 25, 2006). Palinski then filed a collateral attack on his convictions under state law, but the issues raised in those proceedings are not at issue here. *See People v. Palinski*, No. 2-07-0206 (Ill. App. Ct. June 5, 2008) (unpublished).

Palinski now seeks a writ of habeas corpus, claiming that, with respect to the arson conviction: 1) the prosecution violated his due process right to a fair trial by failing to disclose evidence that Palinski had given a false confession to a different crime; 2) the trial court should have suppressed his confession; 3) the trial court made erroneous evidentiary rulings when it admitted the videotaped portion of Palinski's confession, excluded Palinski's expert on Narcissistic Personality Disorder and admitted passages from Palinski's journal. With respect to his solicitation of first degree murder conviction, Palinski claims that the trial court erred when it admitted some of the details of his arson conviction.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief is only granted if the state court's decisions were contrary to or an unreasonable application of federal law as clearly established by the Supreme Court. *See Williams v. Taylor*, 529 U.S. 362, 402-03 (2000). A district court must presume that the state court's determinations of fact are correct unless the petitioner rebuts that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant

9

Supreme Court precedent and arrives" at a contrary result. *Id*. at 405. A state court's decision is an "unreasonable application" of Supreme Court law if the state court identified the correctly identified controlling law but unreasonably applied it to the facts of the case at hand. *See id*. "This reasonableness determination is quite deferential, such that a state decision may stand as long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005); *see also Williams*, 529 U.S. at 410 (an *unreasonable* application of federal law is different from an *incorrect* application of federal law) (emphasis in original). A state court's decision must lie "well outside the boundaries of permissible differences of opinion" to be found objectively unreasonable. *Gilbert v. Merchant*, 488 F.3d 780, 790 (7th Cir. 2007) (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)).

## **DISCUSSION**

I. Procedural Default

Before bringing a habeas claim in federal court, a petitioner must exhaust all remedies available to him in state court. *See Lieberman v. Thomas*, 505 F.3d 665, 669 (7th Cir. 2007). Specifically, a habeas petitioner must fully and fairly present his federal claims to the state courts through one full round of appellate review before he files his federal habeas petition. *O'Sullivan v. Boerkel*, 526 U.S. 838, 845, 848 (1999); *Johnson v. Loftus*, 518 F.3d 453, 455 (7th Cir. 2008). Moreover, a "habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004); *see also Crockett v. Hulick*, 542 F.3d 1183, 1192 (7th Cir. 2008).

With respect to the *Brady* and *Miranda* claims, Palinski presented those issues through one full round of Illinois appellate appeal as required when he raised them to the appellate court and the Illinois Supreme Court on direct appeal. Therefore, he has not procedurally defaulted on those claims.

Palinski also attempts to raise several evidentiary issues from his arson and solicitation trials. Palinski claims that the trial court made erroneous evidentiary rulings during his arson trial when it: 1) admitted only the videotaped portion of his confession in violation of the completeness doctrine; 2) barred Dr. Corcoran's testimony regarding Palinski's Narcissistic Personality Disorder; and 3) admitted the journal passage where Palinski expressed an urge to act out his rage and destroy something beautiful. Additionally, he contends that the trial court in his solicitation of first degree murder trial erred by allowing evidence of his confession in the arson case and his recorded conversation with Mottier.

Typically, a state court's evidentiary rulings are not subject to review in habeas corpus proceedings. *See Howard v. O'Sullivan*, 185 F.3d 721, 724 (7th Cir. 1999). In order to justify review of evidentiary rulings, "a petitioner must establish that the incorrect evidentiary ruling was so prejudicial that it violated his due process right to a fundamentally fair trial, creating the likelihood that an innocent person was convicted." *Dressler v. McCaughtry*, 238 F.3d 908, 914 (7th Cir. 2001). However, before a federal court may even review a state court's evidentiary rulings, the petitioner must exhaust available remedies under state law by presenting the federal claims in state court. *See* 28 U.S.C. § 2254(b); *Johnson v. Pollard*, 559 F.3d 746, 752 (7th Cir. 2009).

"For a constitutional claim to be fairly presented to a state court, both the operative facts and the 'controlling legal principles' must be submitted." *Harding v. Sternes*, 380 F.3d 1034, 1046 (7th

11

Cir. 2004). When a petitioner raises an issue of state evidentiary law as a basis for a writ of habeas corpus, the petitioner has only exhausted state remedies if he presented the alleged evidentiary error as a constitutional violation; merely claiming an error under state evidentiary law is insufficient to give the state court a meaningful opportunity to rule on the substance of federal constitutional claims. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *Harding*, 380 F.3d at 1047. For example, in *Duncan*, the petitioner, convicted of sexual molestation of a 5 year old student, argued on direct appeal that the state trial court erred by admitting testimony of the parent of another child who claimed to have been molested 20 years ago. *See Duncan*, 513 U.S. at 364. After the state appellate affirmed the conviction on the basis that the error was harmless, the petitioner filed for a writ of habeas corpus in federal court, claiming that the testimony denied him of his constitutional right to due process. *See id.* at 365. Finding that the petitioner had not exhausted his remedies under state law prior to seeking a writ of habeas corpus because his appeal only raised issues of state evidentiary law, the Supreme Court held, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." *Id.* at 366.

As in *Duncan*, Palinski only raised issues of state evidentiary law in his direct appeal in state court. His appeal only claimed that the trial court misapplied Illinois evidentiary law. He did not make any claims that the trial court's evidentiary rulings violated his due process rights. Aside from his claims that the prosecution failed to disclose exculpatory evidence and that the denial of his motion to suppress violated *Miranda*, the only constitutional claim presented on direct appeal was that the prosecution violated his due process rights when it failed to preserve potentially exculpatory evidence, a claim that he no longer makes. Because he did not present the federal constitutional

12

issues, the appellate court only applied an abuse of discretion standard, finding that the trial court did not abuse its discretion in making the evidentiary rulings. Therefore, the appellate court did not have an opportunity to address Palinski's constitutional claims related to the evidentiary rulings. Although Palinski also filed a collateral attack in state court, he does not raise any issues from that proceeding in this petition for a writ of habeas corpus. Accordingly, because Palinski has not exhausted his state law remedies with respect to his claims that the trial court's evidentiary rulings violated his due process rights under the Fourteenth Amendment, that portion of his petition for habeas corpus must be dismissed.

II. Disclosure of Exculpatory Evidence

Palinski first claims that the prosecution violated his due process right to a fair trial in the arson trial when it failed to disclose a police officer's report indicating Palinski falsely confessed to a murder that he did not commit. Palinski believes that the evidence would have supported his theory that he falsely confessed to starting the fires because Narcissistic Personality Disorder made him prone to telling lies about himself.

As part of the due process right to a fair trial, prosecutors and police officers must disclose favorable evidence that is material to a defendant's guilt. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001). To establish a *Brady* violation, the plaintiff must show: "1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; 2) the evidence has been suppressed by the government, either willfully or inadvertently; and 3) the suppressed evidence resulted in prejudice." *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007) (quoting *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002)). Prejudice exists only when "the nondisclosure was so serious that there is a reasonable probability

13

that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). If the defendant has access to the evidence before trial through the use of reasonable diligence, the evidence has not been "suppressed." *See United States v. Earnest*, 129 F.3d 906, 910 (7th Cir. 1997). Therefore, a defendant's statements made during an interrogation fall outside of the scope the *Brady* disclosure requirement because the defendant knows what he said during the interrogation. *See Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003) ("Indeed, the duty to disclose falls out, because [the defendant] knew what he had said at the interrogation."), *overruled on other grounds*, *Wallace v. City of Chicago*, 440 F.3d 421, 425-26 (7th Cir. 2006).

Here, when Garlish conducted an interrogation, Palinski falsely confessed to the murder John Conrad in the presence of Cooley. Although the prosecution did not disclose the report until after the jury returned a verdict, Palinski had knowledge of the false confession because he knew what he said to Garlish. Because he knew that he gave a false confession, he could have cross-examined Cooley or called Garlish to testify even though he did not have the report. Therefore, the state courts did not unreasonably apply federal law when they found that the failure to disclose the report of Palinski's false confession did not violate the *Brady* disclosure requirement.

III. Suppression of Palinski's Confession

Palinski contends that his confession should have been suppressed under *Miranda*. "[A] suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and . . . the police must explain this right to him before questioning begins." *Davis v. United States*, 512 U.S. 452, 457 (1994); *see also Miranda v. Arizona*, 384 U.S. 436, 469-73 (1966). If a suspect requests the presence of an attorney, law enforcement may not continue the interrogation until counsel is present or until the suspect initiates further

conversation. *See United States v. McKinley*, 84 F.3d 904, 908 (7th Cir. 1996). Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). Therefore, "[a] defendant must unambiguously request the assistance of counsel in order to invoke his right to an attorney under *Miranda* . . . ." *United States v. Muhammad*, 120 F.3d 688, 689 (7th Cir. 1997); *see also Smith v. Illinois*, 469 U.S. 91, 97-98 (1984) (per curium) ("[A] statement either is such an assertion of the right to counsel or it is not."). If a suspect's statement does not meet the requisite level of clarity, law enforcement officers do not have an obligation to stop the interrogation. *See Davis*, 512 U.S. at 459. Additionally, when a suspect makes an ambiguous statement about his desire for counsel during interrogation, "an officer has no obligation to clarify the ambiguous statement by the accused." *Muhammad*, 120 F.3d at 698.

Here, before Cooley began the interrogation, he advised Palinski of his right to have an attorney present. Palinski then asked if he needed an attorney. Cooley responded that he could not provide Palinski with legal advice and asked if Palinski was willing to proceed with the interview. At that point, Palinski indicated that he was willing to go forward with the interview and he signed the police department's *Miranda* waiver form. In *Davis*, the statement "maybe I should talk to a lawyer" was not an unambiguous request for a lawyer. *See Davis*, 512 U.S. at 462. Similarly, Palinski's question to Cooley regarding whether he needed an attorney does not unambiguously request the presence of an attorney because a reasonable officer would not construe the question as an expression of desire for an attorney's assistance. Additionally, after Palinski's ambiguous question, Cooley had no obligation to clarify whether Palinski wanted an attorney. Because Palinski did not invoke his right to counsel by unambiguously requesting the presence of counsel and because

15

he waived his right to counsel by signing the police department's waiver form before submitting to Cooley's interrogation, Palinski was not entitled to the suppression of his confession.

## **CONCLUSION AND ORDER**

For the reasons stated, Palinski's Petition for Writ of Habeas Corpus is dismissed with respect to the evidentiary issues that he raised and denied with repect to the remaining *Brady* and *Miranda* claims.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:  May 28, 2009